NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| THOMAS P. KELLY,<br><br>*Plaintiff*,<br><br>v.<br><br>RELIANCE STANDARD LIFE INSURANCE COMPANY, and THE PENN MUTUAL LIFE INSURANCE COMPANY,<br><br>*Defendants*. | Civ. Action No. 09-2478 (KSH)<br><br>OPINION |

**Katharine S. Hayden, U.S.D.J.**

This case comes before the court on cross-motions for summary judgment filed by plaintiff, Thomas P. Kelly and defendant Reliance Standard Life Insurance Company ("Reliance"). Earlier, in addressing dispositive motions brought by the parties, the Court remanded to the Reliance Plan Administrator for a "full and fair review" of Kelly's claim for long-term disability ("LTD") benefits. The matter has been re-opened because Reliance again denied Kelly's claim for benefits, and Kelly has appealed the decision to this Court.

The Court must now determine whether Reliance's denial of LTD benefits on remand was an abuse of discretion under the terms of the plan.

**I. Factual Background**

1

In November of 2005, Kelly was employed as a "Managing Director/Advanced Planning/Compliance Officer" at the Edison, New Jersey office of Penn Mutual Life Insurance Co. ("Penn Mutual"). (Pl's Br., Ex. B, Supplemental Cert., ¶ 3.) In this "multiple function position," Kelly had a number of responsibilities, including coordinating and supervising recruiting, running annual compliance meetings and the quarterly supervisor program, coordinating and monitoring joint work among associates, conducting continuing education classes, overseeing trading operations for compliance purposes, and monitoring new business for suitability. (*Id.* at Ex. B, sub-Ex. A.) Kelly was also responsible for conducting yearly Private Office Visits ("POVs") for every agent under the Edison agency's supervisory jurisdiction. (*Id.* at Ex. B, Supplemental Cert., ¶18–20.) In addition, Kelly supervised the "HTK department" and interacted with the "HTK compliance department on all issues concerning the agency." (*Id.* at Ex. B, sub-Ex. A.) As explained by Kelly in his certification, HTK was made up of the "non-housed registered representatives of broker-dealer Horner Townsend and Kent" located throughout New Jersey, whom Kelly helped to manage, train and supervise. (Pl's Br., Ex. B, Supplemental Cert., ¶ 15.) One of Kelly's tasks was to complete a yearly visit to "every HTK Producer of the Edison agency who did not conduct business from an NASD registered branch office." (*Id.* at ¶ 23.) To facilitate Kelly's required travel, Penn Mutual provided him with full lease reimbursement for his car. (*Id.* at ¶10.) Though the parties dispute the degree to which Kelly was required to travel for his job, both agree that there was a requirement that he travel at least 10% of the time. (*Id.*)

On Monday November 7, 2005, Kelly was injured in an automobile accident which "exacerbated existing spinal cord injuries" and prevented him from "being able to perform the duties of [his] current occupation on even a part time basis." (*Id.* at ¶ 46.) Previously, Kelly's

back had been injured in a 1993 snowmobile accident in which he suffered a compression fracture of his spine at T12, degeneration of discs T12-L1 and T11-12, and a posterior spur at the T11-12 interspace with a gibbous deformity. (AR166; Pl's Br., Ex. B, sub-Ex. H.) This resulted in a hospital stay, and Kelly later returned to work at his prior place of employment on partial disability. (AR166.) Kelly told his agency manager at Penn Mutual about his residual disability from the 1993 accident at the time he was employed by Penn Mutual. (Pl's Br., Ex. B, Supplemental Cert., ¶ 45.)

Kelly's doctor, Dr. Dearolf, concluded that the November 7, 2005 car accident aggravated the prior injuries and resulted in an additional "left side disc herniation at L5-S1." (Pl's Br., Ex. B, sub-Ex. H.) Kelly suffered "radicular symptoms along with limited motion in his lumbar and thoracic spine, lumbar sprain and strain, lumbar radiculopathy and degenerative joint disease in his back." (*Id.*) Dr. Dearolf instructed Kelly "not to perform any work of any kind," and prescribed steroid injections and physical therapy. (Amended Compl. ¶ 24.)

At the time of the accident, Kelly was a participant in Penn Mutual's long-term employee disability plan. (Pl's Br. at 4.) Defendant Reliance, the plan administrator, had the discretionary authority to determine eligibility for plan benefits and was also responsible for making benefit payments to eligible participants. (*Id.*) The Reliance plan entitled a "Totally Disabled" participant to receive a monthly benefit of 66-2/3% of his Covered Monthly Earnings after 180 days of total disability (the "Elimination Period") until the age of 66. (Amended Compl. ¶ 51.) In February of 2006, Penn Mutual's Vice President wrote to Kelly about whether Kelly intended to submit a claim for LTD benefits. (*Id.* at ¶ 49.) Kelly timely notified Penn Mutual of his intent to file a claim and completed the necessary forms by May of 2006. (*Id.* at ¶¶ 52–53, 56.) The forms were first sent to the Penn Mutual claims department. (*Id.* at ¶ 55.) It was Penn Mutual's

3

obligation to forward Kelly's claim for benefits along with accurate supporting documentation, such as a job description, to Reliance. (*Id.* at ¶ 61–62.) However, as this Court concluded in the prior summary judgment proceedings, Penn Mutual failed to provide Reliance with Kelly's correct job title or an accurate list of his job duties. (*Id.* at ¶¶ 77–79; Tr. 9:20–10:16 Dec. 14, 2010.)

In an October 23, 2006 letter Reliance denied Kelly's claim for LTD benefits. (Amended Compl. ¶ 95.) The letter included a list of criteria Reliance had used to determine that Kelly was purportedly capable of performing the duties of his "regular occupation." In pertinent part the letter stated:

> Please be aware that your own regular occupation is not your job with a specific employer, it is not your job in a particular work environment, nor is it your specialty in a particular occupation field. In evaluating your eligibility for benefits, we must evaluate your inability to perform your own regular occupation as it is performed in a typical work setting for any employer in the general economy.
>
> . . .
>
> While you may believe that your *job* required a greater level of physical exertion, your *occupation* is classified as *sedentary* by the United States Department of Labor's, Dictionary of Occupational Titles ("DOT"). Your claim for benefits has been evaluated based on your ability to perform a *sedentary* occupation.

(AR121–22.) Kelly timely appealed the denial of benefits. (Amended Compl. ¶ 119.) On March 12, 2007, Reliance informed Kelly that it upheld its denial on appeal. (*Id.* at ¶ 136.)

As a result, Kelly filed suit in this Court against both Reliance and Penn Mutual claiming that Reliance's denial of benefits was arbitrary and capricious and that Penn Mutual had breached its fiduciary duties as a co-fiduciary of the plan. Kelly's complaint included RICO claims against both defendants, which were later dismissed on defendants' motions to dismiss. In

4

addition, the complaint contained a claim alleging a violation of the Family and Medical Leave Act on the part of Penn Mutual, which was dismissed by a stipulation. The remaining claims alleged that the actions of Reliance and Penn Mutual violated ERISA.

Kelly and Reliance filed cross-motions for summary judgment which were argued on December 14, 2010. The Court concluded that the administrative record was deficient, that Reliance had relied on an incorrect definition of Kelly's occupation (a definition which the Third Circuit had already concluded was improper), that Penn Mutual provided an incorrect job description, and that Kelly had not been helpful in providing information during the claim processing. (Tr. 4:1–5:15; 7:15–8:25; 9:20–10:1 Dec. 14, 2010.) As a result, the Court ordered a remand to the Plan Administrator and directed that Reliance should "make a decision on the merits." (*Id.* at 13:3–4.) Kelly was permitted to submit additional evidence to more fully develop the record. (*Id.* at 13:18–25.)

Kelly submitted a supplemental certification which included a detailed description of his job responsibilities, a copy of the correct Penn Mutual job description for his position, and forms indicating other duties delegated to him. (Pl's Br., Ex. B.) Kelly included a follow-up letter from his doctor and MRI scans of his back. (*Id.*) He also claimed for the first time that his inability to perform the required duties "of any occupation have been further exacerbated by the onset and increase of chronic cardiac symptoms." (*Id.* at Ex. B, Supplemental Cert., ¶51.)

On February 18, 2011, Reliance rendered its remand decision, again denying Kelly LTD benefits. (*Id.* Ex. C.) The remand decision was based on the reports of two independent consultants who completed paper reviews of Kelly's claim file—Dr. Robert Green, an orthopedic surgeon and Dr. Gregory Helmer, a cardiology specialist—as well as a report by Jody Barach, the in-house Vocational Specialist, and a letter from Kelly's former supervisor, Frank DePaola,

5

who provided a critique of Kelly's description of his job duties. (*Id.*) The denial letter reiterated the policy language, noting that disability benefits will be paid only where a claimant demonstrates total disability for the Elimination Period. (Pl's Br. Ex. C.) "Elimination period" is defined as "180 consecutive days of Total Disability." (*Id.*) And "Total Disability" is defined as an inability to "perform the substantial and material duties of your regular occupation." (*Id.*) The Elimination Period for Kelly's claim was determined to run from November 26, 2005 to May 25, 2006.[1] (*Id.*) The letter noted that both Dr. Green and Dr. Helmer "opined that no restrictions and limitations [on Kelly's ability to work] are supported through the records for either condition from the date of disability through the end of the 180-day Elimination period." (*Id.*) Specifically, Dr. Green concluded that "there was not sufficient objective information to determine why he was having this discomfort," and thus there was "insufficient evidence to support that there would be any restrictions or limitations during the mentioned timeframe." (*Id.*)

The denial letter further concluded that while Kelly's certification "suggests a job that requires a much greater level of exertion and more extensive travel than would be expected for a generally sedentary-type office job," the letter from Kelly's supervisor indicated that Kelly "grossly exaggerate[d] the level of physical activity involved in [his] job at PML as well as the travel duties." (*Id.*) The denial letter relied on Penn Mutual HR Personnel's May 31, 2006 form, which indicated that Kelly's position "required frequent sitting and only occasional standing and walking with no lift or carry." (*Id.*) As a result, Reliance denied the claim for benefits because

---

[1] As noted above, in his supplemental certification Kelly also claimed to have cardiovascular issues. This resulted in a review of the records from his cardiologist on remand. Because the first cardiac treatment record in the administrative file is dated August of 2006, after the conclusion of the Elimination Period, the Court has not considered Kelly's cardiac condition in its analysis. Therefore, the Court will not discuss the portion of the claim denial related to Kelly's cardiac condition, or the report of the independent cardiologist consultant.

neither of the specialists' opinions supported "restrictions or limitations at or following the date of disability," and neither concluded that Kelly's ability to travel was limited. (*Id.*)

Kelly appealed the remand decision to this Court and is seeking summary judgment on the grounds that the denial of benefits was arbitrary and capricious. Reliance has cross-moved for summary judgment in its favor.

**II. Standard of Review**

*A. Motion for Summary Judgment*

Summary judgment may be granted when there is no genuine issue as to any material fact and [ ] the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The role of the court is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). A factual dispute is genuine if a reasonable jury could find in favor of the nonmoving party and it is material only if it bears on an essential element of the plaintiff's claim. *Fakete v. Aetna, Inc.,* 308 F.3d 335, 337 (3d Cir. 2002). When deciding a summary judgment motion, a court must view the record and draw all inferences in a light most favorable to the opposing party. *Knopick v. Connelly*, 639 F.3d 600, 606 (3d Cir. 2011). "This standard does not change when the issue is presented in the context of cross-motions for summary judgment." *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987).

*B. Standard of Review for Administrator's Determination Under ERISA*

When a benefit plan vests the claim administrator with discretion to make the claim determination, "its interpretations of plan language and benefit determinations are generally subject to an 'abuse of discretion' or 'arbitrary and capricious' standard of review." *Schwarzwaelder v. Merrill Lynch & Co., Inc.*, 606 F. Supp. 2d. 546, 557 (W.D. Pa. 2009) (citing

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). "In the ERISA context, the arbitrary and capricious and abuse of discretion standards of review are essentially identical." *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 845 n.2 (3d Cir. 2011). Both of these phrases are understood to require the Court to uphold the Administrator's decision "unless an underlying interpretation or benefit determination was unreasonable, irrational, or contrary to the language of the plan." *Schwarzwaelder*, 606 F. Supp. 2d. at 557. The court's assessment involves evaluating "the quality and quantity of the medical evidence and the opinions on both sides of the issues. Otherwise, courts would be rendered to nothing more than rubber stamps." *Glenn v. MetLife*, 461 F.3d 660, 674 (6th Cir. 2006), *aff'd by Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008). The burden is on Kelly to demonstrate that Reliance's denial of benefits was arbitrary and capricious. *Schwarzwaelder*, 606 F. Supp. 2d. at 558 (citing *Moskalski v. Bayer Corp.*, 2008 WL 2096892 at *4 (W.D. Pa. May 16, 2008)).

Because "benefits determinations arise in many different contexts and circumstances, . . . the factors to be considered [in reviewing a plan administrator's exercise of discretion] will be varied and case-specific." *Estate of Schwing v. Lilly Health Plan*, 562 F.3d 522, 526 (3d Cir. 2009) (internal quotations omitted). When, as here, the ERISA plan administrator is responsible for both determining eligibility for benefits and paying the benefits awarded, an inherent conflict of interest arises. *Glenn*, 554 U.S. at 114. The Supreme Court has directed that this conflict of interest be viewed as one of the several factors considered in evaluating whether the administrator has abused its discretion. *Id.* at 117.

The focus of review is the "plan administrator's final, post-appeal decision." *Funk v. CIGNA Group Ins.*, 648 F.3d 182, 191 n.11 (3d Cir. 2011)(citing 29 C.F.R. §§ 2560.503–1(h), 2560.503–1(h)(2)(i)–(ii), 2560.503–1(h)(2)(iv) & (3)(ii)). The court may in the course of its

review consider prior decisions "as evidence of the decision-making process that yielded the final decision, and it may be that questionable aspects of or inconsistencies among those pre-final decisions will prove significant in determining whether a plan administrator abused its discretion." *Id.* (citing *Miller*, 632 F.3d at 855–56).

### III. Analysis

In evaluating the reasonableness of Reliance's final, post-appeal determination denying Kelly's claim, the Court considers Reliance's inherent conflict of interest, the questionable aspects of its pre-final decision making process, and, most importantly, three troubling aspects of Reliance's final review: (1) an inappropriately selective evaluation of the evidence, (2) the rejection of self-reported and subjective evidence while relying on a claimed lack of objective evidence, and (3) an absence of any substantive evaluation of material job duties and the claimant's ability to perform them.

#### A. Inappropriately Selective Evaluation of the Evidence

It is abundantly clear that in making its claim determination Reliance relied heavily on the paper-review reports of its hired independent consultants, Dr. Green and Dr. Helmer, while giving less weight to the treatment records of Kelly's treating physician and physical therapist. It is true, as noted by Reliance in its brief, that ERISA plan administrators need not give special deference to the opinions of treating physicians, and are under no "discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 834 (2003). However, an administrator may not "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of treating physicians." *Id. See also Michaels v. Equitable Life Assur. Soc.*, 305 Fed. App'x 896, 906–07 (3d Cir. 2009) (questioning administrators choice to give determining weight to the conclusions

9

of experts paper review reports over the conclusions of claimant's treating physicians); *Moskalski*, 2008 WL 2096892 at *9 ("[T]he selective, self-serving use of medical information is evidence of arbitrary and capricious conduct.")

Reported decisions reflect that courts are troubled where a plan administrator denies a claim by relying on the paper-review reports of consultants that oppose the conclusions of treating physicians. *Schwarzwaelder*, 606 F. Supp. 2d. at 559. *See e.g., Elms v. Prudential Ins. Co. of Am.*, 2008 WL 4444269 at *15 (E.D. Pa. Oct. 2, 2008) (It is "important to note that no doctor who has actually treated [plaintiff] or examined her in person, as opposed to performing a 'file review' has found her to be capable . . . of performing work-related tasks."); *Winkler v. Met. Life Ins. Co.*, 170 Fed. App'x 167 (2d Cir. 2006) (vacating denial as arbitrary where it was based "entirely on the opinions of three independent consultants who never personally examined [plaintiff], while discounting the opinions" of the treating physicians.); *Glenn*, 461 F.3d at 671 (finding it "perplexing" that the plan administrator disregarded the opinion of the "only physician to have personally treated or observed" the claimant); *Kinser v. Plans Admin. Comm. of Citigroup, Inc.*, 488 F. Supp. 2d 1369, 1382–83 (M.D. Ga. 2007) (concluding it was unreasonable for the plan administrator to ignore the treating physician's "clearly stated and supported opinion" and rely instead on "a cold record file-review by a non-examining" consultant.).

A strong emphasis on paper review reports is of even greater concern where, as in this case, the plan administrator had the discretion to supplement the record by requiring an independent medical evaluation ("IME") but chose not to. *See Schwarzwaelder*, 606 F. Supp. 2d. at 558–9. The "decision to forgo an IME and conduct only a paper review, while not rendering a denial of benefits arbitrary *per se*, is another factor to consider in the Court's overall

assessment of the reasonableness of the administrator's decision-making process." *Id.* at 559 (citing *Glenn,* 461 F.3d at 671). *See also Post v. Hartford Ins. Co.*, 501 F.3d 154, 166 (3d Cir. 2007), *abrogated on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008) (noting that while a plan administrator is not required to give treating physicians' opinions special weight, "courts must still consider the circumstances that surround an administrator ordering a paper review."); *Elliot v. Metro. Life Ins. Co.*, 473 F.3d 613, 621 (6th Cir. 2006) ("[A] plan's decision to conduct a file-only review—especially where the right to conduct a physical examination is specifically reserved in the plan—may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination." (internal quotations omitted)).

Here, Dr. Green's report, prepared from a paper file review, discounts Dr. Dearolf's conclusions about Kelly's condition with little or no explanation and appears to selectively ignore the treatment information in the reports of Kelly's physical therapist which detail his pain and progress. Dr. Green noted that Dr. Dearolf found "Kelly is unable to sit for any prolonged period of time or stand for any prolonged period of time which he felt would make him incapable of performing sedentary work. He felt the symptoms would be on a permanent basis unlikely to improve over time." (Pl's Br., Ex. D.)  As to this, Dr. Green offered what is, at best, speculation about Dr. Dearolf's medical assessment and a conclusion that is otherwise unsupported:

> I think if Dr. Dearolf had felt that this was a significant back problem, to prevent this Mr. Kelly from returning to work in even a sedentary position, there would have been further studies to more definitively elucidate the problem.  So based on the records that I have reviewed and from an orthopedic standpoint only, it is my opinion that there is no objective evidence for restrictions or limitations.

(*Id.*)

11

Moreover, despite the fact that Dr. Green did not examine Kelly and admittedly did not review an MRI report[2] and thus did not know "the extent of the supposed herniation of L5-S1," he opined that the proper diagnosis of Kelly's symptoms was less severe than what Dr. Dearolf had posited.  (*Id.*)  "This information reviewed *sounds to me* like a lumbar sprain of mild degenerative, previously somewhat compromised spine." (*Id.* (emphasis added).)  Dr. Green's report provides no medical basis for coming to this conclusion.

Further, Dr. Green discounts the records of Kelly's visits to Dr. Dearolf by noting "most of the complaints and findings reported were subjective in nature."  In response to Penn Mutual's request that he evaluate whether Kelly's condition would have resulted in restrictions or limitations during the Elimination Period, Dr. Green simply noted that although there are records of Kelly complaining of pain, "there was not sufficient objective information to determine why he was having this discomfort" and thus "there is insufficient evidence to support that there would be any restrictions or limitations during the above mentioned timeframe." (*Id.*)

Similarly, Dr. Green only mentioned the "significant notes from the [physical] therapist" briefly, observing that "at the conclusion of each visit, the therapist stated the claimant tolerated the procedure well and was gradually showing improvement." (*Id.*)  Dr. Green did note that in the last physical therapy evaluation in the record, dated June 15, 2006, "the therapist mentioned that claimant still had a significant pain level."  But Dr. Green's report does not reference the portion of that report in which the therapist noted Kelly still had

---

[2] In their briefs, the parties argue at length about the MRI. Kelly claims that Reliance withheld the 16 pages of MRI images from its consultants. (Pl's Br. p. 7.) Reliance, counters by noting that it gave the images to its consultants but Kelly never provided an MRI report analyzing the MRI images. (Def's Opp. Br. p. 12.)   In a letter written after the claim determination, Dr. Green confirmed that he had seen the 16 images but they were poor copies and thus he did not base his conclusions on them. (*Id.* at Ex. F.) This debate appears irrelevant to the ultimate inquiry because regardless of who had what, Dr. Green confirmed he did not rely on the MRI scans in completing his report.

> functional difficulties with bathing, bending, reaching, standing, work activities, riding in a car, climbing stairs, sitting and standing for prolonged periods of more than 15 minutes. He can sit for 30-40 minutes and walk for about 5-10 minutes. Functionally, he notes overall fatigue and diminished attention secondary to fatigue and pain. He also has difficulty driving. . . . He remains quite frustrated with the overall impact on function that pain is causing and difficultly returning to work.

(AR139–40.) This report was written almost a month after the conclusion of the Elimination Period, demonstrating that Kelly suffered from severe pain and had functional difficulties through the end of the relevant period, which provides evidence of restrictions or limitations during the Elimination Period.

In denying Kelly's claim, Reliance relied on Dr. Green's report and failed to give any independent weight to Dr. Dearolf's conclusions or the physical therapy records. (*Id.* at Ex. C.) In fact, aside from quoting Dr. Green's report discounting Dr. Dearolf's medical opinion, Dr. Dearolf's findings and conclusions about Kelly's medical condition as Kelly's treating physician are not mentioned in the denial letter at all. (*Id.*) The problematical reliance on Dr. Green's opinions is clearly evident where the denial letter concludes its evaluation of Kelly's medical condition by stating:

> Both specialists therefore opined that no restrictions or limitations are supported through the records for either condition from the date of disability through the end of the 180-day Elimination Period. What's more, as mentioned above, Dr. Green felt that a lack of follow-up testing ordered by Dr. Dearolf appears inconsistent with your self-reports of the severity of your pain.

(*Id.*) Reliance appears to have disregarded the medical opinion of the only doctor that actually treated Kelly and ignored the reports of his physical therapist which further elaborated on his condition, and instead relied solely on Dr. Green's conclusion that there was a "lack of objective evidence for restrictions or limitations." As indicated, Reliance also chose to forgo an IME.

13

This is significant because, while it is acceptable for the administrator to credit the contrary evidence of a non-treating physician, where a non-treating physician's opinion simply cites to an absence of information it does not serve to refute the treating physician's conclusions, and in and of itself is not a reasonable explanation for denying benefits. *See Mishler v. Met. Life Ins. Co.*, 2007 WL 518875 at *9 (E.D. Mich. Feb. 15, 2007). Courts have noted "the particular appropriateness and helpfulness of an IME in cases in which the claim involves subjective complaints." *Schwarzwaelder*, 606 F. Supp. 2d. at 560. (citing *Klinger v. Verizon Comm., Inc.*, 2007 WL 853833 at *3 (E.D. Pa. Mar. 14, 2007) (noting that a claim administrator who requests an IME "avoid[s] the uncomfortable argument . . . that the administrator reasonably gave greater weight to the opinions of physicians who have not physically examined the plaintiff than to those physicians who did."); *Adams v. Metro. Life Ins. Co.*, 549 F. Supp. 2d 775, 790 (M.D. La. 2007) (where a "case involves subjective accounts . . . the fact that only a file review was conducted is relevant."). Because Reliance (1) substantially relied on Dr. Green's paper review, which discounted and selectively ignored much of the evidence of Kelly's ailments, (2) failed to request an IME, and (3) gave no independent weight to the opinion of the only physician that actually treated Kelly, the Court concludes its exercise of discretion in deciding this claim was arbitrary and capricious.

### B.  *Unreasonable Rejection of Self-Reported and Subjective Evidence*

Courts have also found denials arbitrary where the decision is based largely on the rejection of the claimant's self-reported symptoms and the treating physician's conclusions about those symptoms, when no reasonable basis for rejecting such observations is identified. *See, e.g., Schwarzwaelder*, 606 F. Supp. 2d. at 561–62. A claimant's subjective accounts cannot be wholly dismissed, particularly where, as here, "the plan itself does not restrict the type of

14

evidence that may be used to demonstrate total disability."[3] *Glenn*, 461 F.3d at 672. Courts have also concluded that a claimant's account of pain cannot be ignored simply because it can be characterized as "subjective." *See Audino v. Raytheon Co. Short Term Disability Plan*, 129 Fed. App'x 882, 885 (5th Cir.2005). In a factually similar case involving a claimant with back problems, one court concluded

> The defendants are not free to ignore the plaintiff's chronic and severe pain under the apparent theory that MRIs or EMGs must demonstrate some structural deformity for a person to be disabled because of back pain. Unfortunately for all parties involved, back pain, even severe pain, is not so simple.

*Gellerman v. Jefferson Pilot Financial Ins. Co.*, 376 F. Supp. 2d 724, 734, 376 n.9 (S.D. Tex. 2005).

Here, Dr. Green's report generally ignored Kelly's complaints of pain noted in the physical therapy records, and found that "most of the complaints and findings reported" in Dr. Dearolf's treatment notes "were subjective in nature." (Pl's Br. at Ex. D.)  Dr. Green's report further concludes that because "there was no documentation of any other studies recommended such as an electromyography, functional capacity evaluation, repeat MRI with possible discogram, or any other studies that would help elucidate the problem," there was "no objective evidence for restrictions or limitations." (*Id.*)  He also stated that he felt Dr. Dearolf would have requested or completed "further studies to more definitely elucidate the problem" if it was actually as serious as Kelly suggested. (*Id.*)

Reliance accepted Dr. Green's conclusion that there was "no objective evidence of limitations or restrictions" in denying Kelly's claim.  The determination that objective evidence

---

[3] The Reliance policy merely states that "written proof of Total Disability must be sent to us within ninety (90) days after Total Disability occurs." (AR013.)  The policy does not delineate what is and is not acceptable "written proof."

15

was lacking appears to have been influenced by the fact that Dr. Dearolf did not complete more tests to evaluate Kelly's condition.  Indeed, Reliance reiterated in the denial letter that this was one of the reasons for denying the claim.  But the plan does not explicitly limit the evidence of disability to "objective evidence."  Reliance's decision to accept the conclusions of one physician's paper review, and to discount Kelly's account of his pain which is supported by the observations of the treating physician and physical therapist, further demonstrates that its exercise of discretion in deciding Kelly's claim was arbitrary and capricious.

### C.  Absence of any Substantive Evaluation of Material Job Duties

Under the Reliance benefit plan, "Total Disability" is defined as an inability to "perform the substantial and material duties of your regular occupation." (Pl's Br. Ex. C.)  In denying the parties first cross-motions for summary judgment and ordering a remand, the Court noted that Reliance had denied Kelly's claim by (1) relying on an incorrect job description from Penn Mutual, and (2) improperly defining "regular occupation" generally as opposed to taking into account the actual job duties performed, a practice the Third Circuit expressly rejected in *Lasser v. Reliance Standard life Ins. Co.*, 344 F.3d 381, 387 (3d Cir. 2003). (Tr. 9:20–24, Dec. 14, 2010.) By permitting Kelly to supplement the administrative record on remand with correct information related to his job responsibilities.  The Court pointed out that "now we have the golden opportunity with the blessing of the district court to do it right." (*Id.* at 14:14–15.)

Kelly submitted a 67 paragraph supplemental certification detailing his job responsibilities and injuries and attached nine Exhibits, including the correct Penn Mutual Job Description from his personnel file, as well as numerous delegation forms from his supervisor detailing other responsibilities that had been delegated to him. (Pl's Br. Ex B.)  Reliance provided this information to Kelly's supervisor at Penn Mutual, Frank DePaola, who responded

16

with a three page letter critique. The letter essentially noted that the job description and delegation forms were accurate but that Kelly, as a supervisor himself, could choose to delegate many of the tasks he discussed and that Kelly traveled approximately 10% of the time, but never as much as 45% of the time. (Pl's Br. Ex. E.) This information, along with the reports of Dr. Green and Dr. Helmer, were provided to Reliance's Vocational Specialist for review.

The Vocational Specialist submitted a two page review. The first page is almost completely filled with a copied bulleted list of the job responsibilities for Kelly's Managing Director/Advanced Planning/Compliance Officer position, and half of the second page consists of copied portions of Dr. Green's and Dr. Helmer's paper review reports. (Def's Br. Ex. D.) Beyond the copied portions, the report offers only conclusory remarks and refers to Kelly's position by the wrong title. (*Id.*) It concludes, without any elaboration, that Kelly was required to travel only 10% of the time, had the ability to delegate job duties, "and in light of the medical information referenced, Mr. Kelly would be capable of performing the material duties of a Managing Agent at Penn Mutual Life Insurance Company." (*Id.*)

When evaluating whether Kelly's medical condition precluded him from performing the material duties of his job, Reliance relied heavily on the submission of the Vocational Specialist. (Pl's Br. Ex. C.) Neither the Vocational Specialist nor Reliance determined which duties were material duties of Kelly's job, which duties could be delegated, what degree of physical exertion was required to complete the material duties and whether Kelly could, during the Elimination Period, complete those tasks. In the denial letter, Reliance also uses the DePaola letter to discredit Kelly's description of the physical requirements of his job responsibilities, observing that based on DePaola's information, "many of the statements [Kelly] made in [his] affidavit

17

concerning [his] job requirements grossly exaggerate the level of physical activity involved in [his] job at PML as well as travel duties." (*Id.*)

What actually is "grossly exaggerated" is Reliance's characterization of Kelly's certification. DePaola's letter states that many of the duties Kelly was required to perform were duties he had the option to delegate, and that Kelly from time to time attended out of office meetings he was not required to attend. (Pl's Br. Ex. E.) Reliance inflates DePaola's comments to a broadside attack on Kelly's supplemental certification. But the fact that Kelly had the option to delegate certain job responsibilities he was actively performing prior to the car accident does not mean that by explaining those duties Kelly was exaggerating the requirements of his job in his certification. Moreover, in *Lasser*, the Third Circuit expressly held that the assessment of a claimant's inability to "perform the material duties of his/her regular occupation" requires consideration of the "usual work that the [claimant] *is actually performing* immediately before the onset of the disability." 344 F.3d at 387 (emphasis added).

The apparent wholesale rejection of Kelly's description of his job duties was unreasonable and led to the additional unreasonable failure to countenance the existence of any restrictions or limitations during the Elimination Period. In light of Dr. Dearolf's conclusion that Kelly was unable to perform non-sedentary and sedentary work, and the physical therapist's detailed notes about Kelly's impaired functional ability, it is surprising that neither Dr. Green's report nor Reliance's ultimate denial of benefits suggest that Kelly's condition warranted *any* work place restrictions or limitations. Dr. Green's report concluded there was no objective evidence to support any restrictions or limitations without considering the actual requirements of Kelly's job. The Vocational Specialist relied on Dr. Green's conclusion that no restrictions or limitations were warranted in summarily concluding that Kelly was capable of performing his

job duties. Reliance relied on both of these reports to thereafter deny Kelly's claim for benefits without giving any weight to his treating physician's diagnosis or his own description of his job activities. Reliance's failure to consider the duties Kelly was actually performing prior to the accident and whether Kelly was physically capable of performing those duties after the accident was unreasonable and demonstrates Reliance's exercise of discretion in denying Kelly's claim was arbitrary and capricious.

### IV. Conclusion

On remand, Reliance conducted an inappropriately selective review of the evidence, placed unreasonable emphasis on the reports of consultants who never examined Kelly, chose not to use an IME, and failed to engage in any meaningful analysis of Kelly's material job duties. These deficiencies in the context of Reliance's inherent conflict of interest and questionable pre-final decision activities amount to an arbitrary and capricious exercise of discretion in violation of ERISA.

Accordingly, Kelly's motion for summary judgment with respect to Count I of his Amended Complaint is granted[4], and Reliance's motion for summary judgment is denied. Kelly is entitled to receive the LTD benefits owed to him under the Plan.[5] The Court will entertain Kelly's request to recover costs and attorneys' fees. An appropriate order will be entered.

December, 21st 2011                                        /s/ Katharine S. Hayden
                                                           Katharine S. Hayden, U.S.D.J.

---

[4] It should be noted that Kelly moved for Summary Judgment against both Reliance, Count I of his Amended Complaint, and Penn Mutual, Count II of his Amended Complaint. Penn Mutual filed an opposition brief that opposed only an award of compensatory damages in the event the Court concluded that the denial was arbitrary and capricious. Because neither Kelly nor Penn Mutual presented any arguments relating to Kelly's "specific allegations" against Penn Mutual, the Court has not granted summary judgment as to Count II.

[5] Kelly has also requested an award of "money damages" from Reliance, distinct from the LTD benefit payments owing. Kelly has not argued in his brief why such money damages are warranted, nor presented any facts or law to support the request. Therefore, the court denies Kelly's request for additional money damages.